IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

**STATE OF TENNESSEE v. JAMEE WHITE-MCCRAY**

**Appeal from the Criminal Court for Sullivan County**
**No. S68275   William K. Rogers, Judge**

_____

**No. E2020-01735-CCA-R3-CD**

_____

The Defendant, Jamee White-McCray, was convicted in the Sullivan County Criminal Court of facilitation of attempted first degree premeditated murder and facilitation of employing a firearm during the commission of a dangerous felony and received an effective ten-year sentence to be served in confinement. On appeal, the Defendant contends that the trial court erred by not imposing a sentence of split confinement. After review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JILL BARTEE AYERS, JJ., joined.

Brennan M. Wingerter (on appeal), Assistant Public Defender – Appellate Director, Tennessee District Public Defenders Conference, Franklin, Tennessee, and Gene G. Scott, Jr., and Janet V. Hardin (at trial), Jonesborough, Tennessee, for the appellant, Jamee White-McCray.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Barry P. Staubus, District Attorney General; and Justin B. Irick and Erin McArdle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On January 21, 2017, multiple gunshots were fired at the victim, James Powell, as he was driving a white Chevrolet Impala in the parking lot of an apartment complex. The State theorized that the Defendant was one of the shooters and that the Defendant tried to kill the victim as revenge for the victim's shooting the Defendant in Toledo, Ohio, in

December 2016. In October 2017, the Sullivan County Grand Jury returned a presentment, charging the Defendant with the attempted first degree premediated murder of the victim and employing a firearm during the commission of a dangerous felony. The Defendant went to trial in December 2019.

The State presented the following proof at trial: The victim and the Defendant were both from Toledo, Ohio. On the night of January 21, 2017, Krista Shelton was sitting in her car at a Wendy's drive-through on Stone Drive in Kingsport. While Ms. Shelton was waiting for her food, she saw a white Chevrolet Impala and a gray Ford Focus drive by the restaurant. The cars appeared to be racing, and the Focus was ahead of the Impala. The Impala caught up to the Focus, and Ms. Shelton heard three "pops" and saw the Focus "veer off the road." The Focus hit a tree and wrecked, and the Impala left the scene. Ms. Shelton, who was a nurse, drove to the Focus and saw a man run behind some houses. However, she did not get a good look at the man because it was dark outside. A second man, KC Grant, was lying on his back on the ground outside the passenger side of the Focus. The passenger door of the Focus was open, and Grant appeared to have been dragged from the car. He asked for help, and Ms. Shelton called 911. Grant had been shot in the head with a .32-caliber bullet and died from his wound.

Police officers investigated the shooting and learned that the incident began at an apartment complex about one-half mile from the wreck. Video surveillance of the apartment complex showed that the Focus arrived in the parking lot, parked in a space, and waited for the Impala. When the Impala drove through the parking lot, the Focus pulled out of the parking space and began following the Impala. Three gunshots were fired at the Impala from the Focus. Two gunshots appeared to come from the back of the Focus, and one gunshot appeared to come from the front of the Focus. The two cars then ended up speeding by the Wendy's on Stone Drive where the second shooting and the wreck occurred. Police officers searched the wrecked Focus and found a 9-millimeter semiautomatic handgun on the floorboard of the rear passenger seat. An empty magazine was in the gun, and the slide of the gun was "locked back into the rear position," indicating that all of the ammunition had been fired from the gun. Police officers also found three 9-millimeter shell casings inside the Focus and one 9-millimeter shell casing on the road beside the Focus. A black hat with a white emblem was on the rear passenger seat of the Focus. Police officers found bullet fragments and .45-caliber shell casings in the parking lot of the apartment complex.

Pamela McGee testified that she lived in Kingsport and that the Defendant and another man came to her apartment on the night of January 21, 2017. Timothy William Green testified that he knew the victim in this case, James Powell. On the night of January 21, 2017, a white car driven by the victim pulled up in Green's yard. Green went outside and saw that the car's rear window had been "busted up" and that the side of the car had

been "shot up." The next day, a Kingsport police officer stopped a white Impala being driven by the victim. The car had a flat tire and a "busted" rear window, and bullet holes were in the side of the car. Law enforcement later recovered two .45-caliber bullets and one 9-millimeter bullet that had been fired into the Impala. Based on the bullets and the video from the apartment complex, the police thought that three people had been in the Focus: the driver and two shooters. The police also thought that the shooters had used two firearms: a 9-millimeter and a .45-caliber.

Police officers viewed KC Grant's Facebook page. A video that had been posted on the page on January 21, 2017, showed Grant and the Defendant. The Defendant appeared to be wearing the same black hat that the police found in the Focus after the shootings.

Forensic analysis of the bullet fragments found at the apartment complex and the 9-millimeter bullet recovered from the Impala showed that they were fired from the 9-millimeter handgun found in the Focus. The 9-millimeter cartridge cases found at the scene of the wreck had characteristics similar to the 9-millimeter handgun, but the similarities were insufficient to conclude that the cartridge cases were fired from the gun. A fingerprint was obtained from the handgun, and the fingerprint matched the Defendant's left index finger.

The parties stipulated that on April 11, 2017, an investigator for the Ohio Attorney General's Office interviewed the Defendant. The Defendant told the investigator that he had been traveling to Kingsport for more than a year and that he and KC Grant were "'close friends.'" The Defendant said that the victim had a "'beef'" with him and that the victim either shot him or had someone shoot him in Toledo, Ohio, on December 23, 2016. However, the Defendant denied being in Kingsport on January 21, 2017.

At the conclusion of the State's proof, the jury convicted the Defendant of facilitation of attempted first degree premeditated murder, a Class B felony, and facilitation of employing a firearm during the commission of a dangerous felony, a Class D felony. The trial court held a sentencing hearing on February 20, 2020.

At the outset of the hearing, the State advised the trial court that the Defendant had agreed to concurrent sentences of ten years for the conviction of facilitation of attempted first degree premeditated murder and three years for the conviction of facilitation of employing a firearm during the commission of a dangerous felony; that the Defendant had agreed to waive his right to appeal his convictions; and that the issue of alternative sentencing would be left to the trial court. Defense counsel questioned the Defendant about the terms of the sentencing agreement and advised the trial court that the Defendant was a

Range I, standard offender. The trial court approved the sentencing agreement and effective ten-year sentence.

According to the Defendant's presentence report, the thirty-four-year-old Defendant dropped out of high school after the ninth grade but obtained his GED in 2012. In the report, the Defendant said that he was randomly shot at a "corner store" in Toledo, Ohio, on December 24, 2016, that he did not know who shot him, and that two bullets were "lodged" in his back. The Defendant denied having mental health issues but said he was diagnosed with attention deficit hyperactivity disorder as a child. He stated in the report that he began using "liquor" and marijuana when he was sixteen years old and that he had not received any alcohol or drug treatment but that he had not used alcohol or marijuana since 2017. The report reflected that the Defendant told the presentence report investigator that he worked for McDonalds and that he worked "'under the table'" for roofing, construction, and snow removal companies. The report also reflected that the Defendant began working for McNeals and Sons Construction in Ohio in June 2016.

The Defendant's criminal history spanned eight pages of the presentence report and showed that he had been committing crimes, mostly misdemeanors, in Ohio since he was nineteen years old. His criminal record included convictions of carrying a concealed weapon, which he committed while he was on bond in this case; driving without a license; simple assault; possession of drugs and drug paraphernalia; escape; disorderly conduct; driving on a suspended license; failure to wear a seatbelt; failure to use a child restraint device; filing a false report; domestic violence; operating a vehicle without registration; and larceny of an automobile. According to the report, the Defendant violated probation in 2005 and 2012, and he was disciplined for fighting in jail in July 2018 and February 2019.

The Defendant's Strong-R assessment classified his overall risk level as "high" due to violence. The assessment concluded that he had "high" needs relevant to "Attitudes/Behaviors," "Aggression," "Residential," and "Education"; that he had moderate needs relevant to "Alcohol/Drug Use"; and that he had low needs relevant to "Friends," "Mental Health," "Family," and "Employment."

The trial court noted that the Defendant's criminal history was "lengthy going back years and years" and that his criminal record included forty-eight misdemeanors, "a few felonies," and a felony committed while he was on bond in this case. The trial court also noted that while "several" of the Defendant's misdemeanor convictions were for driving offenses, he also had convictions involving drugs, assaults, and weapons and that his Strong-R assessment classified his risk to reoffend as "high." The trial court stated that the facts of the instant case were "heinous" and "especially egregious" in that the Defendant came to Kingsport from Ohio to "even the score" and that a "shootout" occurred at two

locations. The trial court said that it did not think the Defendant would abide by the terms of probation and that incarceration would protect society from his future criminal conduct. The trial court acknowledged that the jury convicted the Defendant of facilitating the charged offenses but found that measures less restrictive than confinement had been applied unsuccessfully to him, noting that he had "gone from . . . petty crimes . . . to the more serious crimes of . . . murder or attempted murder." The trial court found that a sentence of probation or full probation would unduly depreciate the seriousness of the offenses and that confinement was needed to provide an effective deterrent to others. In closing, the trial court stated that it did not think anyone should "give up on" the Defendant because he was "relatively" young and ordered that he serve his effective ten-year sentence as nine years in confinement followed by one year on probation. The State advised the trial court that the court could not sentence the Defendant to more than one year in jail as a part of a split confinement sentence. The trial court stated, "I will order that he serve the entire ten-year sentence then."

## ANALYSIS

The Defendant contends that the trial court erred by not imposing a sentence of split confinement. The State argues that the trial court properly sentenced the Defendant. We agree with the State.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *see State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) (applying the *Bise* standard to "all sentencing decisions"); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the *Bise* standard to alternative sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* Tenn. Code Ann. §§ 40-35-102, -103, -210; *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

Regarding alternative sentencing for a felony, a defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* Tenn. Code Ann. § 40-35-303(a). The Defendant's sentences meet this requirement. Moreover, a defendant who

is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See* Tenn. Code Ann. § 40-35-102(6). In this case, the Defendant is a standard offender, but his conviction of facilitation of attempted first degree premeditated murder is a Class B felony. *See* Tenn. Code Ann. § 40-35-112(b)(2). Therefore, he is not considered to be a favorable candidate for alternative sentencing.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence is appropriate. *See* Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

Turning to the instant case, the Defendant contests the trial court's finding that confinement is necessary to avoid depreciating the seriousness of the offenses and confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses. First, he asserts that a general finding of deterrence is not sufficient to support an imposition of full confinement and that specific proof must exist to show that deterrence of these particular crimes is needed in the community. Second, he asserts that the trial court failed to cite any circumstances that made these crimes egregious.

In *State v. Hooper*, 29 S.W.3d 1, 10-12 (Tenn. 2000), our supreme court specifically noted the following non-exclusive factors for consideration when denying probation solely upon the basis of deterrence:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;

(2)   Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;

(3)   Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4)  Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective; and

(5)   Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Generally, when denying alternative sentencing based on the seriousness of the offense alone, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting *State v. Grissom*, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997)).  In order for a trial court to deny probation solely on the basis of the offense itself, "the circumstances of the offense *as particularly committed in the case under consideration* must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense." *State v. Trent*, 533 S.W.3d 282, 292-93 (Tenn. 2017) (emphasis in the original).

In *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014), our supreme court explained that "the heightened standard of review [from *Hooper* and *Trotter*] that applies to cases in which the trial court denies probation based on only one of these factors is inapplicable" when the trial court "combined the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense." This court has explained that according to *Sihapanya*,

[I]f only one factor found in Tennessee Code Annotated section 40-35-103(1) is utilized by the trial court, the trial court must make additional findings.  If, however, the trial court bases the denial of alternative sentencing on more than one factor, we review the denial to determine if the trial court abused its discretion.

*State v. Robert Allen Lester, Jr.*, No. M2014-00225-CCA-R3-CD, 2014 WL 5501236, at *5 (Tenn. Crim. App. Oct. 31, 2014).

Here, the trial court considered that the jury convicted the Defendant of facilitation of the charged offenses. However, the trial court found that all three considerations in Tennessee Code Annotated section 40-35-103(1) applied. The Defendant does not contest the trial court's findings regarding subsections (A) and (C). Regarding subsection (B), the trial court found that both the need for deterrence and the seriousness of the offenses also warranted confinement. Therefore, based upon *Sihapanya*, the trial court was not required to make further specific findings. *See State v. Joseph D. Sexton*, No. M2017-00735-CCA-R3-CD, 2018 WL 300532, at *4 (Tenn. Crim. App. Jan. 5, 2018). Accordingly, we conclude that the trial court did not abuse its discretion by denying the Defendant's request for split confinement and by ordering that he serve his effective ten-year sentence in confinement.

## CONCLUSION

Based on the foregoing review of the record and analysis of the issues, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE